Mona L. Burton, #5399
Sherilyn A. Olsen, #9418
Ellen E. Ostrow, #14743
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, UT 84101
Telephone: (801) 799-5800
Fax: (801) 799-5700
mburton@hollandhart.com
solsen@hollandhart.com
eeostrow@hollandhart.com
*Proposed Attorneys for Debtor-In-Possession*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy No. 16-24384 |
| M SPACE HOLDINGS, LLC, | Chapter 11 |
| Debtor-In-Possession, | Honorable _____ |

## DECLARATION OF JEFFREY D. DEUTSCHENDORF
## IN SUPPORT OF CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Jeffrey D. Deutschendorf, declare the following:

1.      I am the Chief Executive Officer and President of M Space Holdings, LLC ("**M Space**"). I have held these positions during the times described in this Declaration.

2.      Based upon my positions with M Space, I am familiar with M Space's day-to-day operations, business, and affairs.

3.      On the date hereof (the "**Petition Date**"), M Space filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Utah.

1

4.      M Space is operating its business and managing its property as a debtor-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in this Chapter 11 case, and a committee has not been appointed.

5.      In order to enable M Space to minimize any adverse effects that filing for Chapter 11 may have on its business, M Space has requested various types of "first day" relief, which are included in M Space's Motion For Order Shortening Time For Notice, Objection and HEairn gin Consideration of First Day Motions (the "**First Day Motion**"), described in more detail below, which this Declaration supports.

6.      The First Day Motion seeks relief intended to allow M Space to perform and meet its obligations necessary to fulfill its duties as a debtor-in-possession.  I am familiar with the contents of the First Day Motion, and I believe that the relief sought by the First Day Motion: (a) is necessary to enable M Space to operate in Chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful, orderly liquidation of the business; (c) best serves M Space's estate and creditors' interest; and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.

7.      M Space maintains books and records that reflect its assets and liabilities.  The petition and schedules filed concurrently herein reflect M Space's assets and liabilities as of the Petition Date.

8.      I also submit this Declaration to provide an overview of M Space, its business, and to support M Space's Chapter 11 petition and the First Day Motion.  Except as otherwise

2

indicated, all facts set forth in this Declaration are: (a) based upon my personal knowledge of M

Space's operations and finances, (b) learned from my review of relevant documents and

information supplied to me by other members of M Space's management and employees, or (c)

my opinion based on my experience, knowledge and information concerning M Space's industry,

operations and financial condition.  I am authorized by M Space's board of directors to submit

this Declaration on behalf of M Space and, if called upon to testify, I could and would testify to

the facts set forth herein.

9.      M Space is a limited liability company formed under the laws of the state of

Delaware on July 31, 2001, originally under the name of M Space Investments. M Space merged

with its wholly-owned subsidiary (M Space, LLC) on March 15, 2006. M Space's principal place

of business is located at 629 Parkway Dr., Suite A, Park City, Utah 84098.  A chart detailing the

ownership structure of M Space is attached as **Exhibit 1**.

10.     M Space is managed by a board of directors.  The board of directors as of the

Petition Date are: Steven J. Giacona, Dan Gross, Alan Arsht, and me.

11.     M Space is a provider of turnkey complex modular space solutions for rent and

sale.  M Space's primary client bases are schools and the oil industry.

12.     In the modular industry, assets are described by "floor" units.  Multiple floors can

be assembled together to form a large building or can be separated to form a smaller space.  Each

floor measures approximately 12x60.  For example, a double-wide modular structure typically

constitutes two floors.

13.     M Space owns approximately 2,450 modular/mobile floors.  Approximately 1,300

floors are buildings utilized by schools across the country.  Approximately 300 of M Space's

floors are dedicated to housing units for the oil industry in North Dakota.  The remaining units are used for commercial building spaces throughout the United States.

14.    In order to expand its operations and to provide it with funds necessary to operate its business, M Space obtained an asset based line of credit in 2004.  In December 2012, M Space paid off its prior revolving line of credit and obtained a new revolving line of credit up to the maximum amount of $60,000,000 (the "**Line of Credit**") with PNC Bank, National Association ("**PNC**") as agent (the "**Agent**") for itself and HSBC Bank USA, National Association ("**HSBC**") (collectively, the "**Secured Parties**").

15.    The terms of the Line of Credit are set forth in the Revolving Credit, Term Loan and Security Agreement (as amended and modified, the "**Prepetition Credit Agreement**") dated December 12, 2012.  A copy of the Prepetition Credit Agreement is attached hereto as **Exhibit 2**. The Line of Credit is secured by substantially all, if not all, of M Space's personal property as well as rent derived from modular units "on rent" with M Space's lessees (the "**Prepetition Collateral**").

16.    The Secured Parties perfected their security interest in the Collateral by filing a UCC Financing Statement with the Delaware Secretary of State on December 12, 2012, Filing Number 20124833663.  As of May 18, 2016, the principal amount owed on the Line of Credit was $59,678,225.

17.    Like other modular space providers in the industry, M Space experienced a significant decline in its commercial and education segments from 2010-2013 due to the economic recession and slowdown.  In the Spring of 2012, M Space expanded its market by providing modular housing and office space to the oil and gas industry, primarily in North

Dakota.  At the time M Space began to expand its business in North Dakota, oil prices were trading at over $90 per barrel.

18.     In late 2014, the Organization of the Petroleum Exporting Countries ("**OPEC**") made a decision to not cut oil production.  As a result, oil prices began a steep decline.  By December 2015, oil was trading at approximately $37.00 per barrel.  By early Spring 2016, M Space began experiencing a substantial decline in rents generated from its North Dakota modular units.  At M Space's peak in 2014, the North Dakota units generated monthly rental income in the amount of approximately $440,000 per month. However, by the Spring of 2016, the North Dakota units generated monthly rental income in the amount of approximately $104,000 per month.

19.     Due to the drastic decrease in rent generated from the North Dakota units, M Space was not able to take advantage of other growth opportunities in the modular industry.  In addition, several of M Space's large commercial rental projects were ending their term, and M Space was not able to move the units to other projects because it did not have sufficient funds to move, refurbish, and reset the modular units that were either coming off rent or in storage yards.

20.     In the Spring of 2015, M Space retained Oppenheimer Company ("**OpCo**") as M Space's investment banker to evaluate options for selling M Space as a going concern and/or to raise junior capital to help M Space through what M Space hoped would be temporary cash shortages.

21.     On M Space's behalf,  OpCo contacted over 100 private equity companies, mezzanine lenders, and B lenders, but a transaction never materialized.

22.     In December 2015, the Secured Parties received an updated appraisal of M Space's assets.  The appraisal concluded that the value of M Space's assets had declined significantly.  As a result thereof, M Space's availability on the Line of Credit was reduced by approximately $1,500,000 in accordance with the provisions of the Prepetition Credit Agreement.

23.      In February 2016, the Secured Parties were entitled to decrease the availability on the Line of Credit by approximately an additional $900,000 under the quarterly amortization provisions of the Prepetition Credit Agreement.  Secured Parties agreed to defer the scheduled amortization subject to certain terms and conditions, including M Space's retention of a chief restructuring officer.

24.     In order to obtain this limited forbearance, M Space retained the services of Michael Correra of Conway MacKenzie, Inc. as chief restructuring officer of M Space.  Mr. Correra presented numerous business options, including selling M Space as a going concern, liquidating M Space, and/or restructuring the Line of Credit with the Secured Parties.

25.     Notwithstanding the deferral of the quarterly amortization by the Secured Parties, M Space's availability under the Prepetition Credit Agreement was constrained by both the borrowing base and the $60,000,000 maximum amount that M Space was contractually permitted to borrow (taking into account discretionary over-advances).  As such, M Space has not been able to pay its debts as they come due and is experiencing increasing demands from creditors across the country.  In one case, a creditor has obtained a preliminary injunction allowing it to collect rents directly on projects owned by M Space.

26.     In order to address its creditors and obligations in one forum and to allow M

Space time to conduct an orderly liquidation of its assets, M Space seeks relief under Chapter 11

of the United States Bankruptcy Code.

**A.      Cash Collateral Motion**[1]

27.     The Secured Parties are willing to consent to the Debtor's use of cash collateral,

but only on the terms and conditions set forth in the Cash Collateral Motion and proposed

Interim Order.

28.     Through the Cash Collateral Motion, M Space seeks authority to use the

Prepetition Collateral and Cash Collateral and to provide adequate protection and a lien to the

Secured Parties.

29.     Absent authority to use Cash Collateral, M Space will not be able to successfully

transition into Chapter 11, orderly liquidate its assets, and otherwise preserve and maximize the

value of its assets for the benefit of its creditors and the estate.

30.     In particular, as reflected in the proposed cash flow budget attached as Exhibit A

(the "**Budget**") to the Cash Collateral Motion, M Space, in consultation with its advisors,

projects that it will need access to approximately $1,028,000 in Cash Collateral to avoid

irreparable harm to its orderly liquidation and administrative efforts from the Petition Date

through June 2016 (the "**Interim Period**").  The prepetition Collateral and Cash Collateral will

be used to pay (i) amounts authorized for payment pursuant to other first day motions filed

concurrently herewith, (ii) operating costs and expenses, and (iii) other administrative and

---

[1] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in Debtor's Motion
for Interim and Final Orders Pursuant to Sections 105(a), 361, 362, 363, 506, 507, and 552 of the Bankruptcy Code:
(I) Authorizing the Use of Collateral and Cash Collateral; (II) Granting Adequate Protection and a Lien; (III)
Scheduling a Final Hearing, and (IV) Granting Related Relief (the "**Cash Collateral Motion**"), filed
contemporaneously herewith.

bankruptcy related expenses projected to be incurred during the Interim Period, as set forth in the Budget.

31.     On a final basis, M Space projects that it will need the ability to use cash collateral through the week ending October 31, 2016 (the "**Budget Period**").

32.     M Space's primary source of cash and ability to maximize value in this case is dependent upon collecting future rents from leases of its modular units and performing an orderly sale of substantially all of its assets. Thus, the use of cash collateral is essential to M Space's ability to efficiently preserve and maximize the value of its assets as it transitions into Chapter 11.

33.     During the Budget Period, with the benefit of the automatic stay and access to the Cash Collateral, M Space intends to focus on conducting a sale of substantially all of its assets. Without access to the Prepetition Collateral and Cash Collateral at this critical point in the case, however, M Space will be unable to orderly liquidate its assets to maximize value for the benefit of its creditors and the estate.

34.     Prior to the Petition Date, M Space discussed with the Secured Parties, M Space's largest creditors, its current financial circumstances, the events leading to the filing of this case, and the overall liquidation strategy for M Space. M Space reviewed its cash flow projections in detail with the Secured Parties, and the parties agreed on terms for the consensual use of Prepetition Collateral and Cash Collateral pursuant to the terms set forth in the Interim Order.

35.     Notably, it became imperative that M Space commence this case as soon as possible in order to preserve value. The agreed-upon use of Prepetition Collateral and Cash

Collateral were negotiated in good faith and at arm's length and represent the best alternative available under these exigent circumstances.

36.     M Space respectfully requests that the Court enter the Interim Order, substantially in the form attached as Exhibit B to the Cash Collateral Motion, granting the following relief, among other relief, on an interim basis:

a.     Authorizing the consensual use of the Prepetition Collateral and Cash Collateral during the Interim Period in the amounts set forth in the proposed Budget and in accordance with terms set forth in the Interim Order;

b.     Authorizing M Space to make the payments contemplated by the proposed Budget during the Interim Period;

c.     Granting the Secured Parties the adequate protection proposed in the Interim Order for M Space's use of the Prepetition Collateral and Cash Collateral, including, without limitation, for any diminution in value resulting from the payment of expenses provided for in the Budget and Interim Order; and

d.     Granting the related relief as set forth in the proposed Interim Order.

37.     Without the ability to use Prepetition Collateral and Cash Collateral, there will be no possibility for M Space to orderly liquidate its assets and maximize the value for creditors. M Space submits that whatever interests the Secured Parties may have in the Prepetition Collateral and Cash Collateral are protected by virtue of the adequate protection provided for in the proposed Interim Order and Final Order, which is subject to an agreed Carve-Out (as defined in the proposed orders) and, in summary, includes:

- Replacement liens and security interests; and

- Superpriority administrative expense claims under section 507(b) of the Bankruptcy Code.

38.     Immediate relief in the form of the proposed Interim Order is necessary to avoid irreparable harm during the Interim Period. Absent approval, M Space will not be able to maximize the value of the estate or orderly liquidate its assets.

39.     Based upon the foregoing, using Prepetition Collateral and Cash Collateral is necessary and appropriate, is in the best interests of M Space and the estate, and should be authorized.

40.     M Space negotiated the terms of the use of Prepetition Collateral and Cash Collateral with the Secured Parties at arm's length, over a period of multiple weeks, in good faith, and obtained the best possible deal that it could under the circumstances.

41.     The Secured Parties will consent to the use of the Prepetition Collateral and Cash Collateral only on the terms and conditions so negotiated as memorialized in the proposed Interim Order for which the Court's approval is sought.  The use of Prepetition Collateral and Cash Collateral represent the only viable way to orderly liquidate its assets, and M Space believes in its business judgment that these provisions are necessary and justified under the circumstances.

**B.**     ***De Minimis* Sales Motion**[2]

42.     Through the *De Minimis* Sales Motion, M Space seeks the authority to sell the *De Minimis* Assets subject only to the notice procedures proposed therein (the "**Sale Notice**

---

[2] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in the Debtor's Motion for an Order Approving Procedures to Sell or Transfer Certain *De Minimis* Assets, Free and Clear of Liens, Claims and Encumbrances Without Further Court Approval ("***De Minimis* Sales Motion**"), filed contemporaneously herewith.

**Procedures**"). The relief requested in the *De Minimis* Sales Motion is necessary to maximize the value of its estate and minimize associated costs.  Additionally, continuing to sell or transfer *De Minimis* Assets during the pendency of this case will eliminate the cost of maintaining nonessential property, and the net proceeds therefrom will be used consistently with the terms of the Cash Collateral Orders.

43.     M Space expects that the value of the *De Minimis* Assets sold in any given transaction will be *de minimis* in comparison to the size and scope of M Space's overall estate and will not exceed gross sales prices in the amount of $1,000,000, in the aggregate.  The Sale Notice Procedures would entitle M Space to consummate an individual sale or transfer with a gross sales price of less than $100,000 without notice, and would allow M Space to consummate a sale of an asset with gross sales prices of more than $100,000, but less than a gross sales price of $250,000 upon compliance with the Sale Notice Procedures.

44.     M Space anticipates that such dispositions: (a) will likely take the form of private sale transactions; and (b) will involve numerous small transactions or a related series of transactions.  Given the relatively immaterial value of these assets and the potential for a significant number of these sales, M Space believes it is appropriate to establish streamlined procedures for notice and approval of each such transaction.  The process for the disposition of *De Minimis* Assets is intended to supplement but not replace a process to auction and sell more valuable assets, and permission from the Court will be sought for each individual transaction with a gross sales price exceeding $250,000.

45.     Although M Space believes that, in most cases, the sales contemplated by the *De Minimis* Sale Motion are sales in the ordinary course of M Space's business, it has filed the

motion out of an abundance of caution and because it believes that some potential purchasers

may be uncomfortable consummating sales without the Court's authorization.  Additionally,

some purchasers of the *De Minimis* Assets may want confirmation that the sales will be free and

clear of liens pursuant to section 363(f) of the Bankruptcy Code.

46.     M Space also believes that the streamlined Sale Notice Procedures proposed

herein will benefit M Space by allowing it to move quickly to sell assets as opportunities arise,

while providing appropriate notice as described in the Motion. Accordingly, M Space has

concluded that it would be more efficient, and that the proceeds realized with respect to such

transactions will be maximized, if M Space is authorized to implement procedures that allow it to

sell *De Minimis* Assets with a gross purchase price of $1,000,000 or less in the aggregate on an

expedited basis without incurring the delay and costs of preparing, filing, serving and having

hearings on motions for approval of each such sale.

47.     The *De Minimis* Assets are subject to the liens of the Secured Parties.

48.     In addition, other creditors may have or assert liens against certain of the *De

Minimis* Assets (collectively, to the extent such liens are valid and properly perfected, the

"**Other Liens**").[3]  The proceeds of the *De Minimis* Assets will be distributed in accordance with

the provisions of the Cash Collateral Order.

---

[3] Except with respect to the Secured Parties and as described in the Cash Collateral Orders, nothing herein shall
constitute a concession or admission by the Debtor that any of the *De Minimis* Assets are subject to valid, perfected
liens of any party and the Debtor hereby reserves all rights to contest claims of liens or other interests in the
applicable assets by any party whatsoever.

49.    Shortly after entry of an order approving the *De Minimus Sales* Motion, M Space

will actively seek to close the following three *De Minimis* Asset sales (collectively, the

"**Anticipated Sales**"): [4]

    a.    Buyer: Solid Foundations

        i.    Gross sales price: $175,000

        ii.    Previously paid deposit: $87,500

        iii.    Anticipated net proceeds to be generated post-petition: $87,500

    b.    Buyer: Pinnacle Academy

        i.    Gross sales price: $148,000

        ii.    Previously paid deposit: $74,000

        iii.    Anticipated net proceeds to be generated post-petition: $74,000

    c.    Buyer: Shining Rock

        i.    Gross sales price: $208,000

        ii.    Previously paid deposit: $50,000

        iii.    Anticipated net proceeds to be generated post-petition: $158,000.

50.    The Secured Parties have approved the Anticipated Sales.

51.    The Anticipated Sales are critical to M Space's ability to operate post-petition.

Absent the ability to close on the Anticipated Sales, M Space will likely not be able to meet its

obligations under the Approved Budget, as defined in the Cash Collateral Motion.

---

[4] These calculations assume that there are no liens with priority over the Secured Parties.

52.     If M Space fails to close on the Anticipated Sales within 45 days of entry of this Order, the projects intended to be sold through the Anticipated Sales may be marketed for sale by the Disposition Agent, as defined in the Interim Cash Collateral Order.

53.     In M Space's business judgment, the proposed sales and Sale Notice Procedures are in the best interests of creditors and the estate.

54.     M Space's primary known secured creditors are the Secured Parties, who will be provided notice for each sale that meets the criteria identified in the Sale Notice Procedures.  In addition, the Sale Notice Procedures require M Space to provide notice to any other known potential lienholders who may assert liens or security interests pursuant to statutes, prepetition agreements or adequate protection orders issued by this Court.

55.     With respect to all of the Notice Parties, M Space will provide them with a minimum of five (5) business days' notice prior to the consummation of any sale.  If any of the Notice Parties objects to a proposed sale on any ground, except if such objection relates solely to the use of proceeds from the sale, then the matter will be resolved by the Court if such objection cannot be resolved amicably by the parties.

**C.      Utility Motion[5]**

56.     In connection with the operation of its business and management of its estate, M Space obtains electricity, gas, and other similar services (collectively, the "**Utility Services**")

---

[5] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in the Debtor's Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "**Utility Motion**"), filed contemporaneously herewith.

from a number of utility companies (collectively the "**Utility Providers**"), including those listed

on **Exhibit A** to the Utility Motion (the "**Utility Provider List**").[6]

57.    M Space intends to pay all post-petition obligations and expects that revenues

generated from its business operations consistent with the terms of the Cash Collateral orders

will be sufficient to pay all undisputed post-petition obligations owed to the Utility Providers in a

timely manner. However, to provide adequate assurance of payment for future services to the

Utility Providers, M Space proposes to deposit an initial sum equal to M Space's estimated

average cost for two (2) weeks of Utility Services (the "**Adequate Assurance Deposit**"), into a

segregated account (the "**Adequate Assurance Account**") within fourteen (14) days of the

Petition Date, subject to interim approval of M Space's post-petition use of cash collateral.

58.    In the ordinary course of business, M Space regularly incurs utility expenses for

Utility Services provided by various Utility Providers.  M Space has a long and established

payment history with most or all of the Utility Providers.  M Space's aggregate average monthly

cost for utility services is approximately $11,845.00. M Space proposes that the Adequate

Assurance Deposit should be approximately $5,945.00.

59.    M Space further proposes to maintain the Adequate Assurance Account with a

minimum balance equal to M Space's estimated average two-week cost of Utility Services

through the Final Hearing on the Utility Motion. Thereafter, M Space proposes to adjust the

amount in the Adequate Assurance Account to reflect the following factors: (i) the termination of

Utility Services by M Space regardless of any Additional Assurance Requests and (ii)

---

[6] The inclusion of any entity on, as well as any omission of any entity from, **Exhibit A** is not an admission by the
Debtor that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and the
Debtor reserves all rights with respect thereto.

agreements with the Utility Providers. These adjustments will permit M Space to maintain the

Adequate Assurance Account with an amount that consistently provides the Utility Providers that

do not otherwise hold deposits or security for their Utility Services with a two-week deposit on

account of such services.

60.     M Space submits that the Adequate Assurance Deposit, taken together with the

facts and circumstances of this Chapter 11 case (together, the "**Proposed Adequate**

**Assurance**"), constitute sufficient adequate assurance to the Utility Providers. Moreover, M

Space is seeking approval of use of cash collateral that M Space believes will provide adequate

liquidity to meet their cash needs during this Chapter 11 case.

61.     As a result, M Space is likely to continue paying, and be able to continue paying,

their obligations to the Utility Providers post-petition.

62.     Although M Space has made an extensive and good-faith effort to identify all the

Utility Providers, certain Utility Providers that currently provide Utility Services to M Space

may not be listed on the Utility Provider List. To the extent that M Space subsequently identifies

additional Utility Providers, or determines that an entity was improperly included as a Utility

Provider, M Space has the authority, in its sole discretion and without further order of this Court,

to amend the Utility Provider List to add or delete any Utility Provider. If M Space adds any

Utility Providers to the Utility Provider List, M Space will serve a copy of the Utility Motion,

along with the applicable portion of the amended Utility Provider List and the interim order or

final order (as applicable), on such Utility Provider within five (5) business days after M Space

files the amended Utility Provider List. Such subsequently added Utility Provider will be subject

to the Adequate Assurance Procedures set forth herein. For any entity that is removed from the

16

Utility Provider List, M Space shall serve that entity with notice of removal and such entity shall have five (5) days from the date of service of such notice to object to that removal.

63.    The Utility Services are essential to the preservation of M Space's estate and assets, and therefore, to the success of its Chapter 11 Case. Should any Utility Provider refuse or discontinue service, even for a brief period, M Space's ability to preserve and maximize the value of its estates could be severely and irreparably harmed. Indeed, any interruption of the Utility Services would disrupt M Space's ability to operate and maintain its business and would thereby negatively affect M Space's customer relationships and revenues. Such a result could seriously jeopardize M Space's reorganization and/or liquidation efforts and, ultimately, its value and constituent recoveries. It is therefore critical that the Utility Services continue uninterrupted.

64.    M Space seeks the relief requested in the Utility Motion with respect to all the Utility Providers providing Utility Services to M Space, including, but not limited to, those listed on the Utility Provider List. M Space reserves the right to supplement the Utility Provider List by filing a notice or notices with this Court.

**D.    KERP Motion[7]**

65.    At M Space's peak in 2014, it had approximately 60 employees.  From the fall of 2015 to March 31, 2016, M Space's workforce decreased to 42.  On April 1, 2016, M Space reduced its work force by 20 additional employees.  By May 20, 2016, M Space will have only 13 full-time employees and 1 part-time employee.  Under the Approved Budget, all but 5 employees will be laid off by the end of September of 2016.

---

[7] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in the Debtor's Motion for an Order Authorizing the Implementation of a Key Employee Retention Plan For Non-Insider Employees (the "**KERP Motion**"), filed contemporaneously herewith.

66.     Due to the distressed status of M Space and prior layoffs, M Space believes a key employee retention plan (the "**KERP**") is necessary in order to retain key employees during the pendency of this Chapter 11 case.

67.     M Space has determined, in the exercise of its reasonable business judgment, that it is necessary and appropriate to implement a KERP as detailed below, for nine (9) non-insider employees (the "**Key Employees**") who are critical to M Space's ability to continue operating efficiently without disruption and without the loss of valuable institutional knowledge during these cases.

68.     M Space has reviewed the KERP with the Secured Parties, and the Secured Parties have indicated their consent to the approval and implementation of the KERP.

69.     The Key Employees are individuals who have valuable and, in some instances, irreplaceable institutional knowledge of M Space's businesses, systems, commercial relationships, and operations and who are integral to maintaining operational stability and driving cash flow.  They are also, therefore, essential to M Space's efforts to engage in an orderly liquidation and wind down in this case.  The Key Employees would be exceptionally difficult to replace under normal circumstances, and it would be even more difficult as a practical matter given the commencement of this case.  It is critical for M Space to do its utmost to ensure the continued commitment and service of the Key Employees during the pendency of this case in order to avoid disruption to its ongoing business operations and irreparable harm to its efforts to maximize value for creditors.

70.     Accordingly, in consultation with the Secured Parties, M Space has developed the proposed KERP with the goal of providing sufficient incentive for the Key Employees to stay

18

employed by M Space without paying an amount greater than is likely necessary to achieve that

result.  In doing so, M Space considered, among other factors, who the Key Employees are, what

specific services they provide, the potential for flight risk, and the incremental cost M Space

would necessarily incur to replace certain of the Key Employees if they were to leave,

recognizing that some of the Key Employees are irreplaceable at this critical stage in the case.  M

Space believes that the following terms strike the appropriate balance under the facts and

circumstances of these cases:

- Payment Amount.  The following nine (9) Key Employees will be eligible to receive payments totaling approximately $211,000 in the aggregate.  The specific amounts which the individuals will be eligible to receive are fixed, as follows:

| Employee | Title | Annual Compensation | Proposed KERP |
|---|---|---|---|
| Christopher Orlovsky | Associate General Counsel | $105,000 | $40,000 |
| Lynette Reilly | Manager Administration/Human Resources | $ 93,000 | $16,000 |
| Nicklas Buroker | Assistant Controller | $ 89,000 | $20,000 |
| Deana Harb | Senior Staff Accountant | $ 73,000 | $27,000 |
| Brian Gimpl | Project Manager | $ 72,000 | $20,000 |
| Toni McGovern | North Dakota Leasing Manager | $ 70,000 | $5,000 |
| Samantha Cipriano | Remarketing Manager | $ 55,000 | $6,000 |
| Charlene Brewster | Controller | $120,000 | $33,000 |
| Wade Bowser | Vice President of operations | $125,000 | $44,000 |

|  |
|---|
| $211,000.00 |

- **Payment Schedule**. The payments will be paid upon the earliest to occur of any of the following events (each a "<u>Transaction</u>"):

  - The earliest to occur of (i) the employee's proposed termination date, as contemplated by the Approved Budget,[8] (ii) the sale of substantially all of M Space's assets; (iii) a restructuring of M Space's current capital structure; (iv) confirmation of a Chapter 11 plan of reorganization or liquidation; (v) conversion of the Chapter 11 case to a Chapter 7 case or dismissal of the Chapter 11 case; or (vi) Employee is terminated without Cause.

- **Termination without Cause**. If a Key Employee is terminated without Cause prior to the completion of a Transaction that would otherwise trigger a KERP payment for a Key Employee, the <u>KERP</u> payment for such employee will be deemed earned and payable upon fourteen (14) days after the date of termination.

- **Termination for Cause**. If a Key Employee is terminated for Cause prior to the completion of a Transaction that would otherwise trigger a KERP payment for a Key Employee, the right of such employee to receive a KERP payment will be deemed forfeited automatically and M Space shall not make any KERP payment to such employee.

- **Determination of Cause**. M Space shall have the sole and exclusive right to determine whether Cause exists to terminate a Key Employee.

71.     The Key Employees will provide the following essential functions post-petition:

a.     <u>Christopher Orlovsky</u>:  Mr. Orlovsky has been employed as M Space's

associate general counsel since May 2012.  In addition to overseeing general

legal matters during the pendency of the Chapter 11 case and completing all

necessary documentation to finalize the estate's wind down/liquidation

which will ultimately result with M Space's termination as a corporate

entity, Mr. Orlovsky will be tasked with and critical to finalizing and

consummating all post-petition sales of Debtor's assets in order to ensure

---

[8] Approved Budget shall have the meaning set forth in the Debtor's Motion for Interim Order Authorizing Debtor's Use of Collateral and Cash Collateral and Granting Adequate Protection Claim and Lien.

compliance with the Interim and Final Orders, as applicable, and any and all laws and/or regulations that may apply. To offset and minimize the estate's legal and professional expenses, Mr. Orlovsky's extensive familiarity with M Space's legal matters, including the negotiation and documentation of all First Day Motions presently before the Court, and his pre-petition dealings with secured and unsecured creditors will be necessary to maximize the estate's value. These cost avoidance measures will be further realized through Mr. Orlovsky negotiating with M Space's secured and unsecured creditors, including those with Senior Third Party Liens, leading to settlements consistent with all Court orders.

a. <u>Lynette Reilly</u>: Ms. Reilly has been employed as M Space's Manager of Administration and Human Resources since 2007. Post-petition, from a Human Resources perspective, Ms. Reilly will handle all aspects of payroll, PEO, healthcare insurance, closing out M Space's pre-petition benefit matters, such as 401K, and all other similar day-to-day human resource functions that will be required while M Space continues as a debtor-in-possession. Ms. Reilly maintaining these functions is an essential cost avoidance measure as she is M Space's existing human resource contact for all such matters. Ms. Reilly is also involved with property insurance and workers compensation reporting that will be required to ensure M Space's assets and employees are protected during post-petition activities. Ms. Reilly's administrative responsibilities going forward will include state title

21

perfection and reporting matters required for asset transfers to eventual

purchasers in liquidation in compliance with state and local regulations.

b.   <u>Nicklas Buroker</u>: Mr. Buroker has been employed since 2013 as M Space's

assistant financial controller.  Mr. Buroker will manage the day to day

control of accounts payable invoices and disbursement of funds per the

approved DIP budget and will assist in DIP budget reporting.  Mr. Buroker

will also produce accounts receivable invoices for current leases and

collection of corresponding funds.  Such collection matters are crucial to M

Space maintaining operational cash flow necessary to support the orderly

liquidation of M Space.  As M Space utilizes custom accounting software,

Mr. Buroker's comprehensive understanding of the systems' intricacies

result with his retention being a significant cost avoidance measure.  Finally,

Mr. Buroker will monitor and manage any new accounts, such as for

utilities, which may be required during the pendency of this Chapter 11

case.

c.   <u>Deana Harb</u>: Ms. Harb has been employed by M Space since 2008 is a

senior staff accountant.  She has been handling and will continue to handle

all of the direct reporting on fleet assets with PNC as may be required by the

Cash Collateral Orders and the Prepetition Agreement.  Ms. Harb has a

comprehensive understanding of M Space's custom accounting software and

has the unparalleled ability to maintain M Space's reporting responsibilities

post-petition in a manner that will be most cost effective to the estate.  In

addition to assisting in day-to-day operations and accounting activities, Ms.

Harb is also necessary for tax accounting purposes.  She will be responsible

for providing 2015 information to M Space's tax preparation accounting

firm as well as filing monthly sales and use tax returns.

d.   <u>Brian Gimpl</u>: Mr. Gimpl is the only remaining Project Manager for M Space

and has been employed with M Space since 2007. Given the size and nature

of M Space's rental fleet being spread across the country, Mr. Gimpl is

required and essential to all aspects of assisting both M Space and the Asset

Disposition Agent's fleet marketing efforts.  Such responsibilities will

include being on-site to show potential purchasers M Space's assets and at

the same time answer any industry specific inquires that purchasers may

have.  Mr. Gimpl has been selected for this role given his decades of

experience in the industry, trustworthy relationships with other modular

companies that will be solicited to purchase units, and exacting knowledge

of M Space's off rent fleet.  These characteristics are essential to M Space's

efforts to maximize the estate's liquidation and recovery value.

e.   <u>Toni McGovern</u>: Ms. McGovern has been employed as M Space's North

Dakota Sales and Leasing Manager since 2014.  Maintaining Ms. McGovern

as an employee is essential to the day-to-day operations of M Space's

residential properties in North Dakota given the diminished staffing M

Space presently has in this area.  She will directly deal with all tenant issues

prior to the sale of M Space's residential assets which is crucial to

maintaining current occupancy and preserving sale value.  Moreover, Ms.

McGovern's efforts to continue to rent housing to new tenants, and thereby

increase occupancy percentages will drive the purchase price of M Space's

North Dakota assets and maximize the estate value for the M Space's

creditors.

f.   Samantha Cipriano: Ms. Cipriano has been employed as M Space's

Remarketing Manager since 2012.  Post-petition Ms. Cipriano will maintain

all existing customer and dealer relationships in order to preserve and

maximize M Space's lease stream revenue and thereby the value of Debtor's

estate.  In order to increase the value of M Space's estate and thereby

maximize recovery for all creditors, Ms. Cipriano will focus on renewal of

existing "on lease" assets.  In addition, Ms. Cipriano's knowledge of the

existing inventory and dealer network familiarity will be key to assisting the

Asset Disposition Agent's ability to locate buyers for both utilized and "off

rent assets".  Ms. Cipriano is also a former administrator for M Space and

will be relied on heavily for assisting with document production, locating

drawings and other documentation necessary for estate administration.

g.   Charlene Brewster: Ms. Brewster has been employed as M Space's financial

controller since 2012.  Ms. Brewster will manage all of the required

accounting during the wind down and liquidation including mandatory

financial reporting to the Court and the Secured Parties.  She will also

ensure M Space files appropriate documentation for tax reporting for both

federal and multiple state and local entities.  She has a comprehensive understanding of M Space's custom accounting software and will eventually handle all day-to-day and reporting during the final months as well as any final HR and payroll requirements.  Ms. Brewster will properly track sold assets and ensure appropriate disposal in the accounting system.

h.  <u>Wade Bowser</u>: Mr. Bowser has been employed as M Space's Vice President of Operations since 2006.  Mr. Bowser has intimate and unsurpassed knowledge of M SPACE's rental fleet which is invaluable to the process of marketing M SPACE's assets for liquidation.  Mr. Bowser's knowledge regarding the quality and mobility of units will be required in discussions/negotiations with potential purchasers.  Mr. Bowser brings over 30 years of industry knowledge and entrenched connections to potential buyers that will be utilized in conjunction with the Asset Disposition Agent's efforts to maximize proceeds from modular unit sales of idle assets. Likewise, while units are on rent, Mr. Bowser deals with all customer interactions and will be able to promote and maximize sales to such entities as they materialize.  Additionally, Mr. Bowser holds M SPACE's license in California which will be needed to liquidate assets in this region.  In the event M Space is required to perform any work prior to sales, which is done exclusively through M Space's vendor network, Mr. Bowser would be the point of contact and responsible for overseeing project management of all such efforts.

72.     None of the Key Employees are part of M Space's executive management team and none of M Space's executive management is included in any way in the proposed KERP.

73.     The KERP, if any, will be paid pursuant to the Cash Collateral Orders.

74.     The KERP is a very limited retention program being offered to only nine (9) employees whom M Space has determined are either irreplaceable or who could be replaced but at a much greater cost to M Space and its bankruptcy estate and at the risk of disrupting operations and M Space's efforts to maximize value.  The structure of the KERP is designed to be simple and straightforward—a key employee who stays employed through the completion of a Transaction or is terminated without Cause before such completion will receive a single payment; alternatively, if a key employee leaves or is terminated before completion of a Transaction, such employee forfeits the right to receive the payment.  In total, the aggregate amount of proposed payments under the KERP is approximately $211,000.

75.     M Space anticipates pursuing a sale, or sales, of substantially all of its assets and a fulsome process to identify other potentially available alternatives that will maximize value through an orderly liquidation of assets.  The KERP is designed to assure that employees are incentivized to complete the important task of properly winding down M Space's operations.  M Space believes that these employees are necessary to wind down its operations and to assist in the administration of this Chapter 11 case.

76.     To date, M Space has already lost several employees and is operating on a skeletal basis.  At this stage, M Space cannot afford to lose important personnel and additional institutional knowledge.  Rather, it needs to be acutely focused on its efforts to identify

restructuring alternatives and to maximize value, and the proposed KERP will assist M Space in doing so.

## E.    Application To Employ H&H[9]

77.    M Space requests the entry of an order to employ H&H as its counsel to perform the legal services that will be necessary in this Chapter 11 case.

78.    M Space has chosen H&H because certain of its attorneys have extensive experience and knowledge of bankruptcy, business reorganization, and M Space/creditor matters, and it has a long-standing client relationship with H&H. The attorneys who will be primarily engaged on this matter will be Sherilyn A. Olsen, Mona L. Burton, and Ellen E. Ostrow.

79.    In addition, certain attorneys at H&H have extensive experience and knowledge in other areas of law which are likely to be involved in this case and their services will also be utilized as necessary. M Space believes that H&H is both well qualified and able to represent it in this Chapter 11 case.

80.    H&H has indicated its willingness to represent M Space in this case, to render the services and to be compensated as set forth below.

81.    M Space contemplates that H&H may provide the full range of legal services required to represent M Space in the course of this case, including:

> a.    To prepare on behalf of M Space any necessary motions, applications, answers orders, reports and papers as required by applicable bankruptcy or nonbankruptcy law, dictated by the demands of the case, or required by the Court, and to represent M Space in proceedings or hearings related thereto;

---

[9] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in the Debtor's Application of the Debtor for Entry of an Order Authorizing the Retention and Employment of Holland & Hart LLP as Counsel for the Debtor (the "**Application to Employ H&H**"), filed contemporaneously herewith.

b.   Provide advice to M Space with respect to its powers and duties as a debtor in possession in the continued conduct of its business;

c.   Negotiate with creditors of M Space and other parties in interest in developing a plan of reorganization and/or liquidation, and taking any necessary steps to obtain confirmation of, and to implement such plan;

d.   Review, analyze and advise M Space regarding claims or causes of action to be pursued on behalf of the estate;

e.   Assist M Space in negotiations with various creditor constituencies regarding an exit, resolution and payment of the creditors' claims herein;

f.   Review and analyze the validity of the claims filed herein and advise M Space as to the filing of objections to claims, if necessary;

g.   To provide continuing legal advice with respect to the bankruptcy, estate, litigation, avoidance actions and miscellaneous other legal matters; and

h.   To perform all other necessary legal services as may be prompted by the needs of M Space in this case.

82.   To the best of M Space's knowledge, H&H does not have any connection with M Space, its creditors or other parties in interest or their respective attorneys, except as set forth in the Olsen Declaration, filed contemporaneously herewith, and is a disinterested person as that term is used in section 101(14) of the Bankruptcy Code.

83.   M Space believes it is in its best interest and that of the bankruptcy estate that H&H be retained as its counsel.  M Space is satisfied from the Olsen Declaration, filed contemporaneously herewith, that H&H does not represent any other entity having an adverse interest to M Space, the bankruptcy estate, or unsecured creditors in this case and is otherwise disinterested, except to the extent set forth in the Olsen Declaration.

F.      **Gordon Brothers Motion**[10]

84.     M Space respectfully requests the entry of an order pursuant to sections 327(a)

and 328 of the Bankruptcy Code to employ GBCI as its asset liquidator to assist with the sale of

substantially all of M Space's assets.

85.     M Space contemplates that GBCI will conduct the sale of substantially all of M

Space's assets through an orderly liquidation and in connection therewith develop and

recommend appropriate (1) strategies for the sale of the assets, (2) pricing and presentation of the

assets, and (3) recommendations to M Space regarding the acceptability of sale offers obtained.

In addition, GBCI will make recommendations with respect to other operational matters in

connection with the implementation of a sale of substantially all of M Space's assets.

86.     As set forth in the Declaration of Michael D. Chartock of GBCI filed in support of

GBCI's retention, PNC retained GBCI's affiliate, Gordon Brothers Asset Advisors, LLC d/b/a

Gordon Brothers-AccuVal, to value certain of M Space's assets on several occasions from

August 2012 to November 2015.

87.     As a condition to the Agent's consent to M Space's use of Prepetition Collateral

and Cash Collateral, M Space agreed to move the Court for the retention of GBCI as M Space's

asset liquidator.

88.     Moreover, as provided for in the Budget, attached to the Cash Collateral Motion

as Exhibit A, the Debtor is required to realize $10,500,000 in proceeds from the sale of some of

its assets before the end of June 2016. GBCI will not provide services as the Asset Liquidator

---

[10] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in the Debtor's
Motion for Entry of an Order Authorizing the Retention and Employment of Gordon Brothers Commercial &
Industrial, LLC as Asset Liquidator for the Debtor (the "**Gordon Brothers Motion**"), filed contemporaneously
herewith.

until approved by the Court.

89.     If the Debtor does not obtain the Court's approval to retain and employ GBCI in sufficient time to finalize the required asset sales, the Debtor will default under the terms of the proposed Cash Collateral Order by failing to realize the proceeds required under the Budget, and the Debtor will suffer immediate and irreparable harm. The Debtor will be unable to preserve and maximize the value of its assets, and the case will likely be converted to one under Chapter 7.

90.     Because GBCI and its affiliates are familiar with M Space's assets and have valued the assets on multiple occasions, in its business judgment, M Space believes that the retention of GBCI is the most cost effective option available to maximize the value of the estate, and is thus in the best interest of creditors and the estate. With GBCI's prepetition knowledge, the sale of substantially all of M Space's assets should be less costly and generate a greater return for creditors.

91.     In addition, M Space has chosen GBCI because certain of its members have extensive experience and knowledge of the mobile and modular industry and the disposition of corporate assets to maximize value. The members who will be primarily engaged on this matter will be Robert J. Maroney and Jim Lightburn.

92.     M Space believes that GBCI is both well qualified and able to obtain the optimal value for creditors and the estate in a sale of all or substantially all of M Space's assets.

93.     With GBCI's experience, the Debtor believes, utilizing reasonable and prudent business judgment, that GBCI's retention is in the best interest of creditors and the estate.

94.     GBCI has indicated its willingness to represent M Space in this case, to render the services, and to be compensated as set forth in the Application.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Jeffrey D. Deutschendorf

8759796_5