Ali M. M. Mojdehi (*Pro Hac Vice*)
Janet D. Gertz (*Pro Hac Vice*)
Allison M. Rego (*Pro Hac Vice*)
**COOLEY LLP**
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 550-6000
Facsimile: (858) 550-6420
amojdehi@cooley.com
jgertz@cooley.com
arego@cooley.com

Brian M. Rothschild, USB #15316
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
BWhite@parsonsbehle.com
TGeorgelas@parsonsbehle.com
BRothschild@parsonsbehle.com
ecf@parsonsbehle.com

*Proposed Attorneys for the Official Committee of
Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| In re: | Case No. 16-24384 |
| M SPACE HOLDINGS, LLC | Chapter 11 |
| Debtor. | Hon. Joel T. Marker |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTOR'S MOTION FOR FINAL ORDER (I) AUTHORIZING THE USE OF
COLLATERAL AND CASH COLLATERAL; (II) GRANTING ADEQUATE
PROTECTION AND LIEN; AND (III) GRANTING RELATED RELIEF**

/ / /

/ / /

The Official Committee of Unsecured Creditors ("Committee") appointed in the case of M Space Holdings, LLC ("Debtor"), by and through its proposed counsel, hereby brings this objection ("Objection") to final approval of the Debtor's motion for use of cash collateral and granting adequate protection (Doc. 9, "Cash Collateral Motion").[1] The Committee respectfully states as follows:

## I.    INTRODUCTION

The relief sought in the Cash Collateral Motion is overbroad and would unduly disadvantage the interests of general unsecured creditors.  As further explained below, the asserted "blanket" lien by the Prepetition Lenders on "all" of the Debtor's property and cash actually appears to be much too short and full of holes.  The true extent of the Prepetition Lenders' collateral is a major consideration in the evaluation of the form of relief, and, in particular, the "adequate protection" that should be granted in connection with that collateral.  As discussed below, the general provisions of the proposed order are overbroad and should be trimmed back.

Moreover, apart from the general mechanics of the proposed order, the distribution mechanics are also unsound.  Distributions on the liquidation of substantially all the assets of the estate do not fit into the rubric of "adequate protection payments."  Moreover, there is no other basis under the Bankruptcy Code for making immediate distributions of this magnitude to a pre-petition creditor, outside of a plan.

For these and other reasons stated in more particularity below, the Committee respectfully requests that the Court would require modification of the proposed order and would instead enter an order in substantially the form of the order attached as **Exhibit A**  hereto (the "Committee Proposed Order").

---

[1] Capitalized terms shall have the meanings ascribed to them herein or in the Cash Collateral Motion, as applicable.

1

## II.    SUMMARY OF OBJECTION

The Committee objects to the following relief requested in the Cash Collateral Motion on final basis as set forth further herein and reflected in Exhibit A hereto:

a.    <u>Unnecessary and Unwarranted Adequate Protection</u>.  The expedited disposition of the Prepetition Lenders' collateral is sufficient adequate protection for the bank. Adequate protection, in the form of liens and claims on previously unencumbered property, payment of interest and other amounts, and an administrative claim is unnecessary and unsupported.[2] (Doc. 45 ("Interim Order"), ¶¶ 3-5, 7, 16-17.)

    i.    <u>Liens on Previously Unencumbered Property</u>.  The Prepetition Lenders should not be provided with liens or superpriority claims on unencumbered property. [Interim Order, ¶¶ 3-4.] The Committee believes that the Debtor's real property interests, property with certificates of title, lease revenue and commercial tort claims are likely unencumbered, that these assets are likely of considerable value, and that they should be preserved for the benefit of the Debtor and unsecured creditors.

    ii.    <u>Administrative Priority Claim.</u>  The Prepetition Lenders should not be granted an entitlement to a superpriority claim under section 507(b) of the Bankruptcy Code as part of the Cash Collateral Motion. [Interim Order, ¶¶5, 7.]  At a minimum, determining entitlement to a claim under 507(b) is premature at this juncture.  The Committee has, thus, proposed language that would reserve the Prepetition Lenders' rights to assert a superpriority administrative claim subject to objection, notice and hearing.

    iii.    <u>Payments to Prepetition Lenders.</u>  The Committee objects to payment of all proceeds of asset dispositions to the Prepetition Lenders. [Interim Order, ¶¶16-17.]  The proceeds received by the Debtor should be segregated and a reasonable holdback should be established.  As set forth further below, the Committee disputes the Debtor's and Prepetition Lenders' conclusion that the Lender's pre-petition lien encumbers substantially all of the Debtor's assets.

b.    <u>Liquidation Timeline.</u> The proposed sale timeline incorporated into the budget should be reasonably extended to ensure that the Order on the Motion does not result in a substantially certain near-term default by the Debtor.  The budget must allow sufficient time for the sale and marketing of the Debtor's assets that will best maximize value.  A forced fire sale will benefit no one.  The sale timeline reflected in the Interim Order, that required $10.5 million in sale proceeds by the end of June, has already not been met. In other words, the "Expiration Date" under the Interim Order of October 28, 2016 has already proven unrealistic and should be extended.  As of the time of this filing, the Committee has not been

---

[2] "Prepetition Lenders" means and refers to PNC Bank, National Association ("PNC"), as agent for itself and HSBC Bank USA, National Association.

provided with a proposed revised budget but a modified budget should be required in connection with entry of a final order.

c.   <u>Section 506(c) Waiver.</u>  Under paragraph 8 of the Interim Order, the Debtor seeks to waive their right to seek to surcharge the Prepetition Lenders for the reasonable and necessary costs of preserving and disposing of their collateral.  Section 506(c) is a fundamental right provided to the Debtor's estate that should not be waived at the inception of this case, particularly where this liquidation is being pursued at the Prepetition Lenders' behest and where there are significant questions as to what constitutes the Prepetition Lenders' cash collateral in the first instance.

d.   <u>Section 552(b) Equities Waiver</u>. Under paragraph 8 of the Interim Order, the Debtor seeks a ruling that the Prepetition Lenders are entitled to rights of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception shall not apply to the Prepetition Lenders with respect to proceeds, product, or profits of their collateral. Section 552(b) governs the effect of prepetition liens on postpetition property, and provides the *Court* (not the Debtor) with discretion to allocate postpetition value to secured and unsecured creditors depending on what transpires during the bankruptcy cases.  Section 552(b) is retrospective, giving the Court the opportunity to look at what actually occurred. A prospective waiver is inappropriate, especially here, where no postpetition financing is being provided.

e.   <u>No Marshaling</u>.  Under paragraph 8 of the Interim Order, the Debtor seeks to limit the Court's ability to apply the equitable doctrine of marshaling, which is intended to prevent the arbitrary action of a senior lienor from destroying the rights of another creditor.  Marshaling may be necessary to protect the interests of general unsecured creditors, and there is no justification or need for a finding on the issue of marshaling in an order authorizing the use of cash collateral.

f.   <u>Committee Professional Fees</u>.   The Committee's professionals should be appropriately compensated for assisting the Committee in performing its fiduciary duties, including for the payment of fees and expenses of the Committee's professionals investigating the claims, liens and security interests of the Prepetition Lenders. The proposed budget includes a line item for "Professional Fees" that ranges from $35,000 to $60,000 per month for the months of June 2016-October 2016. These amounts are insufficient and even more, under the Interim Order (¶7) are to be paid to Debtor's counsel alone on a weekly basis. The Committee understands that the Debtor and the Prepetition Lenders are, for most part, agreeable to revising the Interim Order to treat the Debtor's professionals and the Committee's professionals on equal footing with respect to the amounts proposed to be paid into trust on an interim basis.  However, as noted, the Committee has not reviewed any modified budget that includes both Debtor's counsel and the Committee's counsel.   Additionally, there is no basis for providing Debtor's counsel over three times the "Carve-Out Amount" of that of the Committee in the event a Default Notice is issued. [Interim Order, ¶7(b).] The budget also includes an "Administrative Reserve" of $500,000 which, it appears, is contemplated to be funded from sale proceeds that were supposed to be

3

generated in the month of June but did not come to fruition.  Additionally, the Debtor needs to clarify where the Administrative Reserve is going to come from, if not from June sales.

g.     <u>Restrictions on Debtor.</u>  Under paragraph 9 of the Interim Order, the Debtor is prevented from seeking authority to use cash collateral or seeking authorization for post-petition financing until the Prepetition Lenders are paid in full.  This provision is should terminate if the Prepetition Lenders' agreement for use of cash collateral expires or after an Event of Default.  Put another way, the Debtor's hands should not be tied after the point at which the Prepetition Lenders are no longer consenting to the use of cash collateral.

h.     <u>Events of Default and Remedies.</u>  The Interim Order (¶¶10-11) provides a broad array of Events of Defaults that, when coupled with the severity of the Prepetition Lenders' remedies, are unfair under the circumstances. The Events of Default, as presently enumerated, effectively provide the Prepetition Lenders with complete control of this case and some should be modified as reflected in Exhibit A. Further, the ability of the Debtor, Committee, US Trustee and any other parties in interest to seek relief from the Court, on whatever grounds may be appropriate, in the event the Prepetition Lenders give a Default Notice should not be limited under the order.

i.     <u>Credit Bid and Deemed Allowance.</u>  The Committee has proposed that paragraph 16 of the Interim Order should be revised to include language making clear that any credit bid by the Prepetition Lenders is subject to sections 105 and 363(k) of the Bankruptcy Code.  The Committee is not aware of any authority for the Prepetition Lenders' credit bid rights to be augmented by the cash collateral order and should be consistent with applicable provisions of the Bankruptcy Code. Similarly, the Prepetition Lenders' inclusion of language deemed their claim allowed until there is an order entered in favor of a party challenging their claim runs counter to section 502(a) of the Bankruptcy Code and should be eliminated. [Interim Order, ¶20.]

j.     <u>Committee Challenge.</u>   The Committee should be entitled to an adequate challenge period and moreover, the Prepetition Lenders should not be able to curtail the challenges the Committee may be seek by restricting the definition of "Challenge" under the order or the means by which a "Challenge" may be brought (*e.g.* by contested matter or adversary proceeding). [Interim Order, ¶¶18-19.]

k.     In addition, the Committee requests that any order approving the use of cash collateral include the additional modifications evidenced in the Committee Proposed Order and reflected in chart and blackline[3] attached hereto as **<u>Exhibit B</u>**.

---

[3] The attached blackline reflects a comparison of the Committee Proposed Order with the most recent proposed final order received by the Committee from the Prepetition Lenders and Debtor.

### III.   SUMMARY OF RELEVANT BACKGROUND FACTS
####    A.   Case Background

1.   On May 19, 2016 ("Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.   The Debtor filed the Cash Collateral Motion on the Petition Date.

3.   The Court held a hearing on May 24, 2016 on the Cash Collateral Motion and a number of other first day motions filed by the Debtor.  On May 25, 2016, the Court entered an order authorizing the Debtor's use of cash collateral on an interim basis (Doc. 45, the "Interim Order") and scheduled a hearing to consider the Cash Collateral Motion on a final basis for June 23, 2016 with objections due June 17, 2016.  The hearing and objection deadline were subsequently continued.

4.   On June 1, 2016, the Office of the United States Trustee ("U.S. Trustee") for the District of Utah appointed the Committee, consisting of the following eight members:  (i) Bennett Truck Transport, LLC, (ii) Hi-Tek Sound & Signal, Inc., (iii) Titan Modular Systems, Inc., (iv) Specialized Structures, Inc., (v) First String Space, Inc., (vi) Eklipse Resources, LLC, (vii) J Amtex-NMS Holdings, Inc. d/b/a Southeast Modular Manufacturing, and (viii) Whitley East, LLC and Whitley Evergreen, Inc.

5.   In the time since its appointment, the Committee has and continues to diligently seek information from the Debtor pertaining to key issues such as sale process, pre-petition marketing and the scope and perfection of the Prepetition Lenders' lien. Indeed, the Committee has evaluated the numerous sales noticed by the Debtor and has worked to ensure that the sales procedures proposed by the Debtor incorporate the transparency necessary for the rights of the Committee's constituency to be protected. Moreover, as noted in the Committee's previous submission to the Court (Doc. 118), the Committee raised a number of questions regarding final approval of the Cash Collateral Motion resulting in the Debtor, the Prepetition Lenders and the

133096132 v4

Committee agreeing to continue the time for objection and the hearing on final approval to allow the parties more time to meet and confer in an effort to reach a consensual resolution.

6.   Though some progress was made, as reflected herein and in Exhibits A and B, significant disputes remain.   These stem fundamentally from the Committee's contention that the Prepetition Lenders do not hold a blanket lien as was represented to the Court in approving the terms of the Interim Order in the first instance.

### B.   The Debtor's Prepetition Capitalization

7.   On December 12, 2012, the Debtor, as borrower, entered into that certain Revolving Credit, Term Loan and Security Agreement (as amended, restated, supplemented or otherwise modified, the "Prepetition Credit Agreement", and together with all ancillary agreements, the "Prepetition Credit Facility") with the Prepetition Lenders.   The Prepetition Lenders sought to perfect their lien by filing a UCC Financing Statement in Delaware. [*See, e.g.,* Doc. 6 (Debtor's First Day Declaration), ¶16.]

8.   The Debtor has stipulated that as of the Petition Date there was approximately $59.7 million due under the Prepetition Credit Facility. [*See* Interim Order, at 2.]   The Debtor has elected to largely forego its rights to challenge the Prepetition Lenders' lien or to bring claims against the Prepetition Lenders. [*Id.*, ¶18.]

9.   The Debtor's schedules reflect approximately $4.3 million in secured claims other than that asserted by the Prepetition Lenders. [*See* Doc. 4, at 1.]

10. The Debtor's schedules reflect approximately $4.85 million in priority and nonpriority unsecured claims as of the Petition Date. [*See id.*]   This amount may well increase through the case as, for example, by virtue of the rejection of executory contracts.

11. The Debtor's schedules also reflect total assets valued, many based on tax records, at approximately $66 million. [*Id.*] The Debtor's first monthly operating report reflects total assets of almost $80 million. [Doc. 94, at 6.]

### C.    Debtor's Proposed Use of Cash Collateral

12. As it stands under the Interim Order, the Lenders have consented to the Debtor's use of their purported cash collateral for a period of approximately five months following the Petition Date, subject to numerous defaults, covenants, and waivers, and in accordance with a budget. Respectfully, the relief sought is overreaching under the circumstances where this case is being pursued at the behest of and for the benefit of the Prepetition Lenders who sought out bankruptcy as a forum in which to accomplish an organized liquidation.

13. The Debtor and Prepetition Lenders now seek entry of an order authorizing substantially all of the relief granted in the Interim Order, as well as certain additional relief, on a final basis.

## IV.    THE COMMITTEE'S INITIAL ANALYSIS REVEALS GROUNDS FOR CHALLENGING THE PREPETITION LENDERS' LIENS

The Committee's ongoing analysis of the claim and lien asserted by the Prepetition Lenders raises meaningful doubt that the premise on which the Interim Order was granted—that the Prepetition Lenders' hold a blanket lien—is accurate.[4]   As set out in further detail below, the Committee believes that significant assets of the estate are unencumbered.

### A.    The Prepetition Lenders' Loan is Not Secured by All of the Debtor's Property

#### 1.    The Scope of Prepetition Lenders' Lien Does Not Reach Proceeds of Leased Modular Units

The Prepetition Lenders filed a UCC-1 Financing Statement against "[a]ll assets of the Debtor . . . ." with the Delaware Department of State on December 12, 2012.  The Uniform Commercial Code (herein referred to as the "UCC") provides that in case of any inconsistency between the description of the Collateral in the UCC-1 Financing Statement and the description of the Collateral in the security agreement, the security agreement description controls.  As such, the overbroad description of the Collateral filed by the Prepetition Lenders does not extend the scope of the Prepetition Lenders' lien, as agreed with the Debtor.

---

[4] The Committee reserves all rights in objecting to or otherwise challenging the claim and lien asserted by the Prepetition Lenders and the discussion herein is not by way of limitation.

Principally in this respect, the Prepetition Credit Agreement[5], defines "Inventory" as follows:

> [A]s to each Loan Party all of such Loan Party's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, **to be furnished** under any consignment arrangement, contract of service or **held** for **sale** or **lease**, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Loan Party's business or used in **selling** or **furnishing** such goods, merchandise and other personal property, and all documents of title or other documents representing them.
>
> [Prepetition Credit Agreement, at 16 (emphasis added)].

This definition appears to the Committee to cover only the goods "*held*" for sale or lease, but does *not* include the standard UCC provision, goods that "are *leased* by a person as lessor." This is of significance because the Prepetition Credit Agreement definition of "Receivables" (Prepetition Credit Agreement, at 23) includes only the accounts that are proceeds of "Inventory," or the rendition of services, and would therefore appear to exclude lease revenue. Thus, there are legitimate Challenges that must be made to the Bank's entitlement to a lien in any Receivables, as that term is defined under the Prepetition Credit Agreement, other than generated by actual sales, or from services, which themselves are not subject to a post-petition lien of the Prepetition Lenders, under section 552 of the Bankruptcy Code. Also, in light of the plain language of the Pre-petition Credit Agreement that excludes leased goods from the Collateral, the Prepetition Lenders would also not have a lien in the proceeds of a sale of the modular units, *subject to* a current lease.

### 2.    The Prepetition Lenders' Lien is not Perfected in Real Property and Commercial Steel Buildings

As noted in the Committee's prior filing, the Debtor scheduled a 50% joint tenancy interest in certain real property and two fixtures described as "Commercial Steel Building[s]." [Doc. 4, Questions 55.1-55.3.]  The Debtor's schedules reflect an aggregate value of over $3.6 million.  The Committee is informed and believes that the Prepetition Lenders did not file anything other than the UCC-1 Financing Statement described above as a means of perfection.

---

[5] The Prepetition Credit Agreement was filed by the Debtor at Docket Numbers 7-1 through 7-4.

133096132 v4

Based on the parties' meet and confer efforts in connection with this Motion, the Committee does not believe there is a genuine dispute that the Prepetition Lenders' lien is not perfected as to the Commercial Steel Buildings. The Committee is informed by the Debtor that it has not yet received title to its 50% real property interest described above which title the Debtor is entitled to by contract, though the Committee understands the Debtor is attempting to remedy this title issue. Nonetheless, the Committee's view is that the Prepetition Lenders' lien is not perfected as to the Debtor's contractual interest in real property. Under UCC §9-109(d)(1), Article 9 does not apply "to the creation or transfer of an interest in or lien on real property, including a lease on rents thereunder."

### 3. The Prepetition Lenders' Lien May Not Be Perfected in Modular Units Required to Have a Certificate of Title

Under UCC §9-303(c), the local law of the jurisdiction under whose certificate of title[6] goods are covered governs (i) perfection, (ii) the effect of perfection or nonperfection, and (iii) the priority of a security interest in goods covered by a certificate of title from the time the goods become covered by the certificate of title until the goods cease to be covered by the certificate of title. Section 9-311(a)(2) of the UCC provides that filing a financing statement is not effective to perfect a security in property subject to any certificate of title statute of the enacting state which provides for a security interest to be indicated on the certificate as a condition or result of perfection. There is an exception for inventory held for sale or lease or actually leased by a debtor in the business of selling goods of the kind, which may be perfected by filing of a UCC-1. That being said, this exception does *not* apply to interests in goods held for lease or being leased by a *leasing company* not in the business of selling the goods. A leasing company must comply with the titling statute. Furthermore, "the fact that the debtor eventually sells the goods does not, of itself, mean that the debtor "is in the business of selling goods of that kind." *See* Comment 4

---

[6] UCC 9-102(a)(10) defines "certificate of title" as a certificate with respect to which a statute provides for a security interest in question to be indicated on the certificate as a condition or result of the security interest's obtaining priority over the rights of a lien creditor with respect to the collateral.

133096132 v4

to UCC §9-311.  Likewise, if a debtor uses the goods, *e.g.*, as equipment, then the filed financing statement is no longer effective to perfect the security interest.  *Id.*

Here, it is a question of fact as to whether, in 2012 when the Prepetition Lenders' filed their financing statement, the Debtor was a "leasing company."[7]  Also, in connection with any "sales," made under, *e.g.*, finance leases, inquiry should be made whether they are true sales. As such, there are factual questions that must be answered first in order to determine whether the Prepetition Lenders must have complied with all applicable titling statutes.  The Committee is aware, at a minimum, of applicable titling statutes in California. We understand that the Prepetition Lenders have not complied with the requirements of the titling statutes in California. If these were required to be complied with, the Prepetition Lenders' lien in the California modular units may be avoided for the benefit of general unsecured creditors under the strong arm powers of the Bankruptcy Code.

### 4.    The Prepetition Lenders' Lien Only Reaches Commercial Tort Claims Expressly Described in the Prepetition Credit Agreement

Under UCC §9-108(e), commercial tort claims must be expressly described in a security agreement, it is not sufficient to describe this collateral by type.  The Prepetition Lenders' lien is not perfected as to any commercial tort claims that are not specifically described in the Prepetition Credit Agreement.

### 5.    The Committee Will Need to Further Investigate the Prepetition Lenders' Liens on Possessory Interests

Merely taking possession can perfect security interests in certain goods, stocks, bonds and negotiable instruments.  To the extent the Prepetition Lenders have relied upon Section 18.1 of the Pre-Petition Credit Agreement, it is not effective to perfect. [8]  Mr. Deutschendorf is not the Prepetition Lenders' agent.

---

[7] "Our company has grown quickly from a **small regional modular leasing company** to a fully integrated modular general contractor . . . ."  *See* http://www.mspaceholdings.com/about-us  (last visited July 7, 2016) (emphasis added).

[8] This provision appoints Jeffrey Deutschendorf as the Custodian of all "Leases, certificates of title, Manufacturer's Statements of Origin and all other bills of sale, purchase orders, purchase contracts or other instruments evidencing the transfer to, or the ownership by, a Loan party of a unit of Inventory and

### B.    PNC May be Subject to Preference Liability

The Prepetition Lenders may have preference liability, in connection with payments in the amount of over $2 million in the ninety-day period prior its bankruptcy filing. [*See* Doc. 63, 19-53.] Only a handful of these payments are denoted as having been interest payments.

## V.    OBJECTION TO RELIEF SOUGHT IN CASH COLLATERAL MOTION

14.    In exchange for permitting the limited use of purported cash collateral contemplated in the budget, the Prepetition Lenders have demanded and obtained from the Debtor a myriad of protections and waivers, as set forth in the preliminary statement and further discussed below. The Committee submits that the limited use of cash collateral contemplated under the budget warrants significantly more limited relief.  The Committee intends to support, and to date has supported, the Debtor in its liquidation efforts. But, the relief requested under the Cash Collateral Motion gives the Prepetition Lenders too much in exchange for too little.  This is particularly so where substantial portions of the Debtor's cash may not be proceeds of Collateral, and thus are not the Prepetition Lenders' cash collateral.  The Committee is therefore compelled to file this objection.

### A.    Proceeds of Sales Should be Segregated, Not Paid to the Lender in Their Entirety

15.    As set out above, the Committee has ample basis to question the Debtor's and Prepetition Lenders' representations to the Court that the Prepetition Lenders hold a valid, perfected lien on substantially all of the Debtor's assets.  There are significant assets that are likely unencumbered.  The Prepetition Lenders are seeking an order that, subject to the budget, provides for them to receive the immediate payment of all Proceeds of the sale or other disposition of any Adequate Protection Collateral.  Under the circumstances, the Debtor should be required to segregate and account for all proceeds relating to "Excluded Assets," rather than immediately paying them over to the Prepetition Lenders, and the Debtor should be required to segregate and account for a reasonable holdback of proceeds relating to assets that are the subject

---

all the documentation executed and/or delivered or created in connection therewith" to establish the Prepetition Lenders' "constructive possession.

of a Challenge by the Committee. Additionally, in this respect, any post-petition revenue received by the Debtor that is generated by services does not constitute the Prepetition Lenders' cash collateral under section 552 and so, should be segregated. To the extent there are any valid and enforceable liens, they will attach to the proceeds and so, no undue prejudice will befall secured creditors.

16.     Moreover, the Prepetition Lenders are not entitled to payment of their prepetition claims during the course of the case. *Cf. Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.)*, 4 F.3d 1329, 1334 (5th Cir.1993) (bankruptcy court improperly allowed the payment of postpetition funds to satisfy prepetition claims and noting that "[n]either the appellees nor the bankruptcy court cited a specific provision of the Code that would allow the payment of postpetition funds to satisfy prepetition claims"); *Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs.)*, 713 F.2d 211, 216 (6th Cir. 1983) (bankruptcy courts do not have the power to authorize debtors to pay prepetition claims prior to a plan of reorganization); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 296 (W.D. Pa. 1990) ("It is beyond dispute that a debtor may not pay creditors outside of a plan of reorganization.").  The immediate payment over of all proceeds of sale to the Prepetition Lenders also are not "adequate protection payments," nor should they be characterized as such. The proposed payments are more akin to post-petition transfers under section 549.  The Prepetition Lenders appear to be well aware of this having sought specifically to obtain lien encumbered causes of action under section 549. [Interim Order, ¶3.]

17.     The Prepetition Lenders have suggested that this concern can be addressed through inclusion in the final order of language making clear that payments received by the Prepetition Lenders are subject to disgorgement.  The Committee agrees that disgorgement should be provided for (although the parties have not agreed on particular language) but also believes that fairness dictates segregation of proceeds that do not constitute adequate protection payments, as set forth above and reflected in Exhibit A.

**B.      The Debtor and Prepetition Lenders Have Not Demonstrated that Adequate Protection Liens or Claims on Previously Unencumbered Assets Are Necessary**

18.      One fundamental premise is clear in the Committee's view: The Prepetition Lenders' rights should not be augmented by the bankruptcy process. The excessive adequate protection proposed here – in the form of liens and claims on unencumbered collateral and excess payments to the Prepetition Lenders – is unwarranted and unnecessary.  The disposition of the Debtor's assets in a short timeframe, *at the direction of the Prepetition Lenders*, gives the Prepetition Lenders all the protection they need or are entitled to.  Even if the Debtor granted the Prepetition Lenders immediate relief from the automatic stay to liquidate their collateral, the Prepetition Lenders could not likely force a faster sale process outside of bankruptcy and would not obtain the substantial benefits and protections that a section 363 sale provides them.  Under the circumstances, the Debtor and Prepetition Lenders have not met their burden of establishing that the requested adequate protection should be granted and as such, the Prepetition Lenders should not be afforded, *inter alia*, liens on any unencumbered property.

19.      The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy."  *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).  Secured creditors are only entitled to adequate protection to the extent of the anticipated or actual decrease in value of the secured collateral during the bankruptcy case.  S*ee In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987); *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Col. 1995).  A corollary to that rule is that "the adequate protection provided must not substantially exceed that to which the secured creditor is entitled."  *In re Blehm Land & Castle Co.*, 859 F.2d 137 (10th Cir. 1988).  "To determine whether an entity is entitled to adequate protection and the type and the amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case."  *In re Rancher Energy Corp.*, 2010 Bankr. LEXIS 5429, at *7 (Bankr. D. Colo. 2010), *quoting Gellegos*, 193 B.R. at 584.

133096132 v4

20.    Here, neither the Debtor nor the Prepetition Lenders have offered proof of the extent of any actual or threatened post-petition diminution in the value of the Prepetition Lenders' collateral by virtue of the proposed expedited sales process.[9] *See In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005) (secured creditor "must, therefore, prove this decline in value – or the threat of a decline – in order to establish a prima facie case.") Further, neither the Debtor nor the Prepetition Lenders have clearly addressed the appropriate measure of value in the context of adequate protection where this case is a structured liquidation.

21.    Indeed, the Interim Order includes the suggestion that, in fact, the Prepetition Lenders may be oversecured such that the payments they would like to receive would be applied first to accruing interest on their pre-petition loan balance. [*See* Interim Order, ¶17.]  If the Prepetition Lenders are oversecured, that, in and of itself, constitutes a form of adequate protection and should be found sufficient here where the use of cash collateral (even if reasonably extended) is proposed to be of only limited duration.  On the other hand, if the Prepetition Lenders would assert they are undersecured, they would then not be entitled to post-petition interest and would have greater potential exposure under section 547 with respect to the pre-petition payments they received from the Debtors. In any event, the Prepetition Lenders cannot claim to be both oversecured and undersecured at the same time and at present, have failed to articulate or provide evidence of what they assert the value of their collateral to be. Because the Debtor and the Prepetition Lenders have not established a *prima facie* case for adequate protection, this Court should deny the requested adequate protection that seeks to enhance the Prepetition Lenders' rights.

22.    Moreover, the Committee has raised significant disputes relating to what constitutes the Prepetition Lenders' collateral in the first instance, which need to be addressed before the Debtor and Prepetition Lenders can meet their burden in obtaining approval of the

---

[9] While the Debtor's first day declaration identifies the decline in oil prices between 2014 and 2015 as the impetus for its prepetition liquidity crunch (*see* Doc. 6, ¶¶18-19), but oil prices have trended upward since the Petition Date.

adequate protection proposed. *See In re Magan-Racine Assocs., Inc.*, 202 B.R. 660, 663-64 (Bankr. N.D.N.Y. 1996) (denying adequate protection where the debtor and creditor did not provide "sufficient factual information concerning the extent of the [creditor's] lien and the value of the Collateral subject to it as of the date the case was commenced.").

23.    The Committee notes that the Interim Order carves out from the proposed Adequate Protection Liens "causes of action brought pursuant to Bankruptcy Code §§ 544, 547, 548, 550 and 553 and recoveries upon such causes of action" and "vehicles with certificates of title which PNC did not properly perfect a security interest in pre-petition." These carve outs should remain. *See, e.g., In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the debtor but rather are created by operation of bankruptcy law and belong to the debtors' creditors).[10]  As described above, however, the unencumbered assets of the Debtor likely extend far beyond these two categories.[11]  The Committee does not object to the Lenders being granted a replacement lien in existing Collateral—which constitutes a type of adequate protection under section 361(2) of the Bankruptcy Code—but does object to encumbering any property of the estate that was not encumbered as of the Petition Date, including all causes of action under the Bankruptcy Code and all causes of action unencumbered as of the Petition Date.

24.    The parties have attempted to reach a resolution with respect to the "Adequate Protection Lien" sought by the Prepetition Lenders.  As reflected in Exhibit A hereto, some progress has been made in carving out "Excluded Assets" from the "Adequate Protection Lien." However, there still appears to be some dispute with respect to certain causes of action.  In addition, the progress made in carving out the "Excluded Assets" is largely undermined by the Prepetition Lenders' position that should be granted a superiority claim that is secured by a

---

[10] Indeed, some courts have expressly prohibited granting liens on such actions or their proceeds. *See e.g., Official Comm. of Unsecured Creditors v. Goold Elecs. Corp.*, No. 93 C 4196, 1993 WL 408366 at *3-4 (N.D. Ill. Sept. 22, 1993).

[11] The Committee also notes that, as stated above, the Debtor's property bearing certificates of title extends beyond "vehicles."

lien on the Excluded Assets.  The request for a superpriority claim is premature and moreover, there is no authority under section 507(b) for granting a *secured* superpriority claim.

**C.**     **The Prepetition Lenders' Request for a Determination that they are Entitled to a Superpriority Claim Pursuant to Section 507(b) is Premature**

25.     No determination should be made at this time that the Prepetition Lenders are entitled to any superpriority claim pursuant to section 507(b) of the Bankruptcy Code. A superpriority claim under section 507(b) is allowed only "to the extent that the stay in bankruptcy has actually reduced the value of the collateral, notwithstanding the terms of a stipulation regarding adequate protection." *In re Blehm Land & Cattle Co.*, 859 F.2d 137, 140-41 (10th Cir. 1988).  Thus, the section comes into play only if adequate protection later proves to be inadequate. *See, e.g., In re Carpet Center Leasing Co., Inc.*, 991 F.2d 682, 685 (11th Cir. 1993).

26.     Here, the Prepetition Lenders and the Debtor have not made any showing that the bankruptcy has actually reduced the value of the Prepetition Lenders' collateral nor could they convincingly do so at the start of this case. The Committee has no objection to the inclusion in the final order of a reservation of the Prepetition Lenders' right to assert a superpriority claim subject to notice, hearing and objection (without limitation) at that time. As expressed above, this case is currently slated to proceed as an expedited liquidation as directed by the Prepetition Lenders and so, the likelihood that they will have a valid claim for diminution of their collateral by virtue of the stay appears low.  Additionally, as touched on above, the Prepetition Lenders' position that should be granted a secured superiority claim is unsupported by section 507(b).

**D.**     **Surcharge Rights Under Section 506(c) Should Not be Waived at This Juncture**

27.     The Committee objects to the waiver of the Debtor's and all parties-in-interest's ability to surcharge the Prepetition Lenders collateral under section 506(c) where, as currently framed, the Debtor's bankruptcy case is being pursued for the sole benefit of the Prepetition Lenders.  Although there may not ultimately be a basis for which to seek to surcharge the Prepetition Lenders' collateral, that right and potential avenue for recovery for the benefit of the Debtor's estate should not be foreclosed at the outset of this case. *See In re AFCO Enterprises,*

*Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors.").  For example, in *AFCO Enterprises* the court applied section 506(c) to require the secured creditor to pay, among other things, the fees and costs of the Chapter 11 Trustee's professionals.

28.    By attempting to waive these rights, the Debtor is agreeing to pay for any and all expenses associated with the preservation and disposition of the Prepetition Lenders' collateral, including those for which the Debtor could show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure."  *Brookfield Prod. Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984) (citations omitted).  Due to the limited duration, arguably limited nature of the budget and the absence of postpetition financing, such relief is inappropriate at this time.  S*ee generally Harford Underwriters Ins. v. Union Planters Bank N.A. (In re Hen House Interstate Inc.)*, 530 U.S. 1 (2000) (debtor's decision to waive section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").

**E.    The Waiver of the "Equities of Case" Exception Under 552(b) is Inappropriate**

29.    The Interim Order (¶8(d)) proposes the Prepetition Lenders will never be subject to the "equities of case" exception to section 552(b) of the Bankruptcy Code.  In effect, the Debtor asks this Court for a binding advisory ruling that there will never be equities of this case that may justify, after notice and a hearing under section 552(b), a distribution to unsecured creditors from the postpetition efforts of the Debtor's employees and other stakeholders. At this early stage of the case, the Court is not in a position to determine what the "equities of the case" may be or assess the impact of the elimination of such a remedy.

30.    There is no legal support for this relief, particularly in the context of a cash collateral order, because the equities-of-the-case exception contained in section 552(b) of the

Bankruptcy Code is a statutory grant of power to the Court, not the Debtor.  Unlike section 363 or section 364, there is no phrase "the trustee may" (or may not) in section 552(b).  The statute governs the effect of prepetition liens on postpetition property, and leaves to the Court's *retrospective* discretion to justify the allocation of postpetition value to secured and unsecured creditors depending on what transpires.

31.    Accordingly, prospective waivers of the equities-of-the-case exception are inappropriate and should not be approved.  *See, e.g., Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (denying request for 552(b) waiver as premature because factual record was not fully developed); *In re Metaldyne Corp.*, No. 09-13412, 2009 WL 2883045, at \*6 (Bankr. S.D.N.Y. June 23, 2009) (declining to waive equities of the case exception in connection with approval of debtor's use of cash collateral).

### F.    The Equitable Doctrine of Marshaling Should be Preserved

32.    Marshaling requires a "senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit."  *In re Advanced Marketing Servs., Inc.*, 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007).  Marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security."  *Meyer v. United State*s, 375 U.S. 233, 236 (1963).  But, the doctrine is not so limited and marshaling can be pursued by Committees and for the benefit of unsecured creditors and indeed, can apply in the context of requiring a secured creditor to recover first against a fund held by a non-debtor, such as a guarantor.  *See e.g., In re America's Hobby Ctr., Inc.*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("Because a debtor in possession has all the rights and powers of a trustee . . . [the Committee] standing in the shoes of the debtor in possession . . . can assert this [marshaling] claim.").  The Committee acknowledges that there may ultimately be no basis for marshaling to apply in this case, but the estate's right to seek to apply the doctrine should be

preserved at this juncture, particularly where the Debtor's schedules indicate the presence of guarantors of the obligations to the Prepetition Lenders.

### G.     The Committee Must be Adequately Funded to Have an Opportunity to Fulfill its Fiduciary Duties

33.     As an initial point, Local Rule 4001-2(a)(1)(F) requires that a motion relating to cash collateral or adequate protection specifically state the justification for any "[p]rovisions that provide disparate treatment for professionals retained by a creditors' committee from that provided for professionals by the debtor."  Here, the Interim Order proposes disparate treatment for the Committee's professionals, without justification, (1) with respect to the proposed cap on fees and costs after a Default Notice or the Expiration Date for which Debtor's counsel is provided over three times the amount of Committee counsel (Interim Order, ¶7(b)); and (2) with respect to the proposal that Debtor's counsel is to be paid, on a weekly basis, the entire amount budgeted for Professional Fees in the budget (Interim Order, ¶7).  As noted above, and reflected in Exhibit A, the Committee believes that the Debtor is in agreement that the entire line item in the budget for Professional Fees should not be paid to Debtor's counsel alone and that paragraph 7 of the Interim Order should be revised in this respect.  However, as also noted, the Committee has not received any modified budget for review.  Moreover, no agreement has been reached with respect to the disparate post-Default Notice professional fees and costs cap.

34.     Second, the Committee needs to be given the tools to permit it to exercise its fiduciary duties, and the Committee should be given access to such funding as is reasonably necessary to fulfill its obligations in these cases. [12] Although the budget proposes an administrative reserve of $500,000, it is unclear to the Committee what property this reserve is to come from and what the Debtor anticipates its own professional fees and costs will be.

### H.     Events of Default and Remedies

35.     The Interim Order includes numerous Events of Default that allow the Prepetition Lenders to exert substantial control over this case and include such nebulous provisions as the

---

[12] Of course, professionals will remain subject to the fee application procedures established by this Court, and the reasonableness standards mandated by the Bankruptcy Code.

19

133096132 v4

"occurrence of a material adverse change, from and after the Petition Date." [Interim Order, ¶10.] Such provisions may well be inappropriately broad where they constrain the Debtor's fiduciary duties which run to all creditors, not just the Prepetition Lenders—adequate protection and cash collateral are not "vehicles to be used to overreach or control a debtor." *In re Gallegos Research Grp., Corp.*, 193 B.R. 577, 586 (Bankr. D. Colo. 1995). Coupled with this, the Prepetition Lenders seek significant remedies for any Event of Default, including relief from stay. [*Id.*, ¶12.]

36.    The Committee believes that the Events of Default under the Interim Order should be tailored to the circumstances of this, as reflected in Exhibit A, so as not to allow the Prepetition Lenders the ability to declare a default at will. In addition, the mechanism to respond to a Default Notice by the Prepetition Lenders should have teeth given the severity of the remedies provided.  More specifically, the Interim Order required the Prepetition Lenders to give written notice of an Event Default and allows for five business day period to obtain a waiver from the Prepetition Lenders or obtain relief from the Court.  [*Id.*, ¶12(b).]  This five business day period should (1) apply to all Events of Default; (2) apply to all remedies; and (3) the ability to seek intervention of the Court should not be limited to relief "solely on grounds of the non-occurrence or timely cure of the Event of Default." [*Id.*]

I.    **Challenge Rights and Challenge Period**

37.    The Committee is prepared to perform a full investigation into the liens and claims of the Prepetition Lenders, and any claims against the Prepetition Lenders, but requests in an abundance of caution a moderate extension of the time proposed for doing so from 60 days after the formation of the Committee to 75 days.

38.    The Committee also believes, as reflected in Exhibit A, the definition of "Challenge" under paragraph 19 of the Interim Order which should be revised to make clear that the Committee can file an adversary proceeding or contested matters seeking to object to or challenging the Debtor's stipulations (Interim Order, ¶18), including but not limited to the items enumerated in paragraph 19(a)-(c).  As currently proposed, any Challenge would necessitate an

133096132 v4

adversary proceeding, which may or may not be required under the applicable rules, may be too narrow to address the forum for litigation of a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim, as well as appeals relating to any of the same, and otherwise does not mirror the rights the Debtor is seeking to waive.  Furthermore, the Challenges may be most cost-effectively resolved by mediation, which should be expressly included in the definition of Challenge.

**J.      Technical Modifications**

39.     The Committee respectfully requests incorporates Committee Proposed Order hereto by reference and requests that any modifications reflected in Exhibit A Committee Proposed Order and not expressly addressed further in this filing be adopted.

**VI.   CONCLUSION**

40.     At this time, the Committee respectfully requests that the Court sustain the Committee's objections and enter an order finally approving the Debtor's use of cash collateral as modified based on the concerns raised herein.


Dated: July 7, 2016                              Respectfully submitted,

                                                 **COOLEY LLP**


                                                 By:  /s/ Ali M.M. Mojdehi
                                                     Ali M. M. Mojdehi
                                                     Janet D. Gertz
                                                     Allison M. Rego


                                                 *Proposed Attorneys for the Official Committee*
                                                 *of Unsecured Creditors*